IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

ANDREW E. BLAKE             *
           Petitioner,
       v.                      *     CIVIL ACTION NO. WDQ-03-1093

JAMES V. PEGUESE, *et al.*     *
           Respondents.

                              ******

## MEMORANDUM

Petitioner filed a Petition for writ of habeas corpus relief under 28 U.S.C. §2254 challenging his 1997 convictions in the Circuit Court for Baltimore City for first degree murder, attempted second degree murder, and conspiracy to commit murder.[1] Presently before the Court are the Petition and the State's Answer and exhibits. Paper No. 1 & Paper No. 12, Ex. 1-33. Upon review of the pleadings, the Court finds no need for an evidentiary hearing. *See* 28 U.S.C. § 2254(e)(2); Rule 8(a), *Rules Governing Section 2254 Cases in the United States District Courts.* For reasons that follow, the Petition is hereby denied.

## I. PROCEDURAL HISTORY

Following a jury trial with Judge Kathleen O'Ferrall Friedman presiding, Petitioner was found guilty of the first degree premeditated murder of Michael Bennett Jr., attempted second degree murder of

---

[1] Petitioner is serving a life term for first degree murder, a consecutive thirty-year term for attempted second degree murder, and a consecutive life term for conspiracy to commit murder. *See* Paper No. 12, Ex. 21 at 67-68.

Ellsworth Cornish, and conspiracy to commit first degree murder of Michael Bennett Jr.[2]  Paper No. 12,

Ex. 9-20.     As indicated by the Maryland Court of Special Appeals on direct review, the evidence

adduced at trial to support Petitioner's convictions including the following:

> Ellsworth Cornish, the State's lead witness, testified that he was the brother-in-law of
> Michael Bennett, the victim, and had known appellants for years.  He testified that on the
> night of July 17, 1995, at approximately 9:30 p.m. he was standing on Vickers Road when
> Andrew, Myron, and William "pulled up" and spoke to him, saying, "what's going on, man,
> you know, what's up whatch y'all, what's going on?"  He said that after speaking, they
> pulled off, went up a street, made a U-turn, came back, and stopped in front of him again.
> He related that although they spoke to him again, they were looking around "like they were
> looking for somebody...."  Mr. [Cornish] detected no hostility in these brief encounters.

> After appellants left, Michael Bennett pulled up and Mr. [Cornish] got in the car with him.
> Mr. Bennett had just come from the direction for which appellants were headed, and
> seemed nervous and scared.  Bennett and [Cornish] exchanged some words and then
> appellant pulled up behind them.  Bennett pulled away from the curb and began driving
> "pretty fast."  Mr. [Cornish] related that appellants stayed right behind them.  Then, when
> appellants began to pull up beside them, Bennett attempted to cut them off.  Several times
> appellants tried to pull abreast of the victims' vehicle, and several times Mr. Bennett
> prevented them from dong so until, finally, Bennett and [Cornish] slouched down in their
> seats because they were afraid that appellants would begin shooting.

>           Mr. [Cornish] testified:

>>           When we slouched down, Michael reached under his seat, came
>> up with a pistol.  I don't know if Michael fired first or they fired first, but
>> the -- it happened all simultaneously.  As soon as one gunfire started, there
>> was repeated gunfire from halfway up Longwood where the tennis court
>> is before you get to Carlisle and Longwood–
>>                                  * * *
>> There was continued gunfire from there until we -- until we run off the
>> road and crashed into a tree and I know Michael didn't fire -- if he fired
>> twice, that was the most he fired.
>>                                  * * *

---

[2]          Petitioner elected to be tried with co-defendants Myron Johnson and William Blake, the
Petitioner's brother.  Paper No. 12, Ex. 8 at 133-134.

When the gunfire started it....was just repeated gunfire, like they had semi-automatic or automatic weapons -- it was repeated.  There was no break in the gunfire until they stopped shooting.  From the time they started it never stopped.

The evidence was that Andrew had driven and William and Myron done the shooting using two 9 millimeter semi-automatic weapons.  Mr. Bennett died and Mr. [Cornish] received injuries to his back and to his foot as a result of the shooting.

Apparently, the appellants did not know Michael Bennett very well, if at all.  Mr. Bennett on the night of the shooting was driving the car of a local drug dealer named Junior or "Junie" King.  There was evidence that William had been in fights with Junie's "workers," and William was aware that Junie had a contract on William's life.  Appellants attempted, unsuccessfully, to elicit testimony that Michael Bennett worked for Junie King and, in fact, had set out to accomplish the "hit" on William that night.  The State elicited testimony that King and Bennett had similar hair cuts and complexions, thereby suggesting a case of mistaken identity.

The State introduced into evidence the recorded statements of Andrew Blake and Myron Johnson.  According to Andrew's statement, he came to Baltimore on the afternoon of the shooting to visit his son.  His son and son's mother were not at home when he arrived, so he went to meet his brother, William, and his friend, Myron Johnson, at Myron's home.  When Andrew arrived, William told him that a guy was trying to get him and Myron.  Then the three just went out riding around and looking for old friends.  Andrew was driving.  According to Andrew, the appellants approached a black station wagon, were shot at twice, and then the wagon sped off.  Andrew followed and caught up to the wagon, and William and Myron began shooting back.

In his statement, Myron Johnson did not give a reason why appellants were driving around the neighborhood on the night of the shooting.  Myron stated that appellants were driving behind a black station wagon when the shots began.  There were four shots, three of which hit appellants' vehicle.  The shots had come from the driver's side of the wagon.  Myron ducked and then began shooting back.  Myron was shooting out the right side of the vehicle and the wagon was on the right.  As appellants pulled closer to the wagon, Myron began leaning out the car window in order to shoot.

Paper No. 12, Ex. 24 at 1-4.

As was his right, Petitioner filed an appeal with the Court of Special Appeals of Maryland.

He raised the following three questions for consideration:

I. Did the trial court err in denying his motion to dismiss for lack of a speedy trial?

II. Did the trial court err in refusing to hold an evidentiary hearing on his motion for new trial? and

III. Did the trial court err in refusing to instruct the jury on the right to arm oneself in anticipation of attack?

*Id.*, Exs. 22 & 23.

On November 6, 1998, the Court of Special Appeals affirmed Petitioner's convictions.  *Id.*, Ex. 24.  Petitioner raised the same issues in his petition for a writ of certiorari to the Court of Appeals of Maryland.  *Id.*, Ex. 25.  On February 11, 1999, the Court of Appeals denied the petition. *Id.*, Ex. 26.

Petitioner initiated state post conviction proceedings in the Circuit Court for Baltimore City on October 27, 1999.[3]  *Id.*, Exs. 1 & 27.  An amended petition was filed by counsel in October of 2000.  *Id.*, Ex. 28.  On October 17, 2001, and January 22, 2002, Judge Marcella Holland held post-conviction hearings on the petition, as amended.  *Id.*, Exs. 29 & 30.   In an April 17, 2002, decision which denied post-conviction relief, Judge Holland summarized the claims presented as follows:

A. The trial court committed constitutional error when it denied Petitioner's motion to dismiss for lack of a speedy trial;

B. The trial court committed constitutional error when it denied Petitioner's motion for a new trial on the grounds of juror misconduct;

C. The trial court committed constitutional error when it declined to strike a seated juror who knew the murder victim's mother;

D. The trial court committed constitutional error when it allowed the recorded statement of Andrew Blake to be played to the jury outside of Petitioner's presence;

---

[3] The hearings also considered the post conviction petitions filed by William Blake and Myron Johnson.

E.      The trial court committed constitutional error when it refused to give a jury instruction regarding Petitioner's right to arm in advance; and

F.      Trial counsel was constitutionally ineffective in not properly arguing the aforementioned issues.[4]

Paper No. 12, Ex. 31.

Petitioner filed an application for leave to appeal, raising the same claims presented in his amended petition for post-conviction relief. *Id*., Ex. 32. The Maryland Court of Special Appeals summarily denied the application for leave to appeal on January 15, 2003, and issued its mandate on February 14, 2003. *Id*., Ex. 33.

Petitioner filed this § 2254 Petition, raising the following grounds:

A.      Petitioner's speedy trial rights were violated;[5]

B.      The trial judge erred in denying an evidentiary hearing on the issue of juror misconduct;

C.      Petitioner received ineffective assistance when trial counsel David Eaton failed to: (i) meet with Petitioner or respond to his communications in advance of trial as to adequately and properly prepare a defense; (ii) failed to forward any of the discovery in the case to Petitioner; and (iii) failed to meet with witnesses; and

D.      The trial court erred by declining to strike a juror who knew the victim's mother.

Paper No. 1 at 6.

---

[4]      These claims were raised in Petitioner's amended complaint for post conviction relief. *See* Paper No. 12, Ex. 28. In the original petition, Petitioner solely raised claims of ineffective assistance based on counsel's alleged failure to meet and communicate with Petitioner during the pre-trial stage and to investigate "material witnesses." *Id*., Exhibit 27. The ineffective assistance of counsel claims raised in the original petition were not pursued during the post-conviction hearings before Circuit Court Judge Holland. *Id*., Exs. 29 and 30.

[5]      Petitioner claims that he was arrested on August 3, 1995, and that his trial did not commence until October 30, 1997. Paper No. 1 at 6, § 15.A.

## II. THRESHOLD CONSIDERATIONS

### A. Exhaustion of State Remedies

Before a petitioner may seek habeas relief in federal court, he must exhaust each claim presented to the federal court by pursuing remedies available in state court.  This exhaustion requirement is satisfied by "fairly presenting" the claims in each state court so as to obtain review in the highest state court with jurisdiction to consider the claims. *See* 28 U.S.C. §2254(b) and (c); *O'Sullivan v. Boerckel*, 526 U.S. 838, 842-49 (1999); *Gray v. Netherland*, 518 U.S. 152, 161-65 (1996); *Coleman v. Thompson*, 501 U.S. 722, 731-32 (1991); *see also Baldwin v. Reese*, 541 U.S. 27, 29 (2004).  As Petitioner no longer has any state direct appeal or post-conviction remedies available to him with respect to the claims before this Court, his claims will be considered exhausted for the purpose of federal habeas corpus review.

### B.  Procedural Default

Where a petitioner has failed to present a claim to the highest state court with jurisdiction to hear it, whether it be by failing to raise the claim in post conviction proceedings or on direct appeal, or by failing to timely note an appeal, the procedural default doctrine applies. *See Coleman v. Thompson*, 501 U. S. at 749-50 (failure to note timely appeal); *Murray v. Carrier*, 477 U. S. 478, 489-91 (1986) (failure to raise claim on direct appeal); *Murch v. Mottram*, 409 U. S. 41, 46 (1972) (failure to raise claim during post conviction); *Bradley v. Davis*, 551 F. Supp. 479, 481 (D. Md. 1982) (failure to seek leave to appeal denial of post conviction relief).  A procedural default also may occur where a state court declines "to consider the merits [of a claim] on the basis of an adequate and independent state procedural rule." *Yeatts v. Angelone*, 166 F.3d 255, 260 (4th Cir. 1999).

The procedural default doctrine bars consideration of a claim in a petition for habeas corpus absent a showing of cause and prejudice or actual innocence.  *See Murray v. Carrier*, 477 U. S. at 495; *Wainwright v. Sykes*, 433 U.S. 72, 86 (1977).  Even where a petitioner fails to show cause and prejudice for a procedural default, a court must still consider whether it should reach the merits of a petitioner's claims in order to prevent a fundamental miscarriage of justice.  *See Schlup v. Delo*, 513 U. S. 298, 314 (1995).

### C. Standard of Review

Because this petition was filed after April 24, 1996, it is to be decided under amendments to the habeas corpus statutes contained in the Antiterrorism and Effective Death Penalty Act ("AEDPA").  *See Woodford v. Garceau*, 538 U.S. 202, 207 (2003); *Beck v. Angelone*, 261 F.3d 377, 380 n.3 (4th Cir. 2001).   AEDPA modified the federal court's role in habeas proceedings in order to prevent federal "retrials" and to ensure that state court convictions are given effect to the extent possible under law.  *See Bell v. Cone*, 535 U.S. 685, 693 (2002).  Pursuant to statute, a federal court may not grant a writ of habeas corpus unless the state's adjudication on the merits:

> 1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States; or
>
> 2)  resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

Section 2254(d) is a "highly deferential standard for evaluating state-court rulings," *Lindh v. Murphy*, 521 U.S. 320, 333,  n.7 (1997), "which demands that state court decisions be given the benefit of the doubt," *Woodford v. Visciotti*, 537 U.S. 19, 24 (2002) (*per curium*).  In *Williams v. Taylor*, 529

U.S. 362 (2000), Justice O'Connor explained that a state court decision is "contrary to" clearly established federal law, when "the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the Supreme] Court has on a set of materially indistinguishable facts." *Id*. at 412-413.  A state court decision is based on an "unreasonable application" of clearly established federal law when "the state court  identifies the correct  governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." *Id*.  "[A] federal habeas court making the 'unreasonable application' inquiry should ask whether the state court's application of clearly established federal law was objectively unreasonable." *Id*. at 409-410.

Further, federal courts give great deference to a state court's factual findings.  *See Hill v. Johnson*, 210 F.3d 481, 485 (5th  Cir. 2000).  Section 2254(e)(1) provides that a determination of a factual issue made by a state court shall be presumed to be correct absent clear and convincing evidence to the contrary.   The applicant has the burden of rebutting the presumption of correctness.   A decision adjudicated on the merits in a state court and based on a factual determination will not be overturned on factual grounds unless objectively unreasonable in light of the evidence presented in the state court proceeding.  *See Miller-El v. Cockrell*, 537 U.S. 322, 340 (2003).

### III.  PETITIONER'S CLAIMS

### A.  Speedy Trial

Petitioner contends that he was denied a speedy trial, a claim which he raised unsuccessfully on direct appeal.[6]  In its decision affirming the judgment of the trial court, the Court of Special Appeals analyzed this claim under the four factor balancing test announced by the Supreme Court in *Barker v. Wingo*, 407 U.S. 514 (1972);[7] *see also Epps v. State*, 276 Md. 96, 104, 106 (1975).   Paper No. 12, Ex. 24 at 4-11.

First, the Court of Special Appeals acknowledged there was a delay of over two years between Petitioner's August 1995 arrest and his October 1997 trial.  *Id.*, Ex. 24 at 5.  It noted, however, that various postponements had occurred due to the recuperation of the primary homicide detective from several surgeries; the unavailability of prosecuting and defense attorneys; the lack of an available courtroom; and the serious illness of the assigned trial judge.   *Id.*, Ex. 24 at 6-7.  The Court of Special Appeals concluded that approximately eleven of the almost twenty-seven month delay was not chargeable to the State and that the portion of the delay attributable to the State was caused by overcrowded dockets and the occasional unavailability of the prosecutor.  *Id.*, Ex. 24 at 7-8.  The intermediate appellate court determined there was no suggestion in the record that the delay had been purposeful or caused by prosecutorial misconduct.  *Id.*, Ex. 24 at 8.

---

[6]       To the extent that Petitioner alleges a violation of Md. Rule 4-271, his ground fails because it does not set out a cognizable claim under the U.S. Constitution or the laws and treaties of the United States. *See Estelle v. McGuire*, 502 U.S. 62, 67 (1991).

[7]       To determine whether a constitutional right to a speedy trial was denied, a court must balance the following four factors: (i) the length of the delay; (ii) the reason for the delay; (iii) the defendant's assertion of a right to a speedy trial; and (iv) the prejudice to the defendant's case caused by the delay.  *See Barker v. Wingo*, 407 U.S. at 530-37.

The Court of Special Appeals concluded that Petitioner had made a timely assert of his right to a speedy trial and next addressed the question of prejudice.  Petitioner, through appellate counsel, had claimed that the delay had prejudiced his defense because one defense witness, Leon Darby, had died and because defense counsel "lost contact" with three other defense witnesses  during this period.  The Court of Special Appeals determined that although the pretrial incarceration was long, it was neither oppressive nor prejudicial, and that because the witness called by the defense at trial testified to essentially the same matters the unavailable witnesses would have addressed,  the evidence would have been cumulative.[8]
*Id.*, Ex. 24 at 9-10.

In balancing the *Wingo* factors the Court of Special Appeals found that although the delay was lengthy and Petitioner had been vigilant in asserting his right to a speedy trial, much of the delay was caused by circumstances largely out of the State's control.  It concluded that there was no deliberate attempt by the State to hamper Petitioner's defense and that, most significantly, Petitioner's defense was not so impaired by the delay as to warrant reversal of the judgments.  Paper No. 12, Ex. 24 at 11.

As noted earlier, there is a presumption that the facts found by the state court are correct.  *See* 28 U.S.C. §2254(e)(1);  *Woodford v. Visciotti*, 537 U.S. at 24; *Lindh v. Murphy*, 521 U.S. at 333 n.7. Upon review of the record, including but not limited to the transcripts of pre-trial and trial proceedings and

---

[8]        The Court of Special Appeals concurred with the trial court's findings with regard to the issue of prejudice.  The Court of Special Appeals observed that no record was made regarding any efforts to locate the "lost" witnesses.  Additionally, it found that none of the unavailable witnesses, including the deceased, had witnessed any of the events on the night of the shooting. The unavailable witnesses were to have testified that the State's lead witness, who was the brother-in-law of the murder victim, was a member of a drug gang and that the drug lord of the neighborhood had threatened Petitioner's brother, Michael Blake, because the brother was seeking to get the drug trade out of the neighborhood.  At trial, another defense witness testified to these matters.   Paper No. 12, Ex. 24 at 10.

the hearing on the motion to dismiss, it is clear that the Court of Special Appeals' findings of fact are supported by the record. *See* Paper No. 12, Exs. 2-7; Ex. 8 at 4-56; Ex. 18 at 12-60 & 69. Further, the undersigned finds that the state court properly applied the Supreme Court precedent set out in *Wingo* in a reasonable manner. *See* 28 U.S.C. § 2254(d). Consequently, this claim is hereby denied.

## B. Denial of Evidentiary Hearing

Petitioner next claims that he was improperly denied an evidentiary hearing by the trial court in regard to juror misconduct. Petitioner, through counsel, raised this issue on direct appeal before the Court of Special Appeals. The appellate court review of the underlying facts of this ground may be summarized as follows:

Prior to disposition of the case, counsel for co-defendant William Blake moved for a new trial because a juror had contacted him and stated that she had felt "undue pressure to convict because jury members had deliberated for 24 hours and everyone was ready to go." *See* Paper No. 12, Ex. 21 at 13; Ex. 24 at 11. The juror further stated that "she felt she had to rush to a decision and because of the pressure of the family being present in the courtroom." *Id*. Additionally, she told defense counsel that members of the jury did legal research and had brought in outside materials which were used by the jury during deliberation. Paper No. 12, Ex. 21 at 13-23; Ex. 24 at 12.

Both Petitioner and co-defendant Myron Johnson joined in the motion for new trial. The trial court agreed to hear the motion, but declined to hold a hearing and to hear testimony from the juror. The trial court reasoned that the jury verdict had been entered almost two months before the juror decided to come

forward.  Moreover, under Maryland law, a perfected verdict cannot be later retracted.  *See Eades v.*
*State*, 75 Md. App. 411, 416 (1988).  The trial judge stated: "There may be some circumstances under
which a jury verdict can be set aside,  but I do not think there are any circumstances proffered here today
that suggest that this court should have a hearing to impeach the verdict or that there are any reasons to
impeach it."  Paper No. 12, Ex. 21 at 23; Ex. 24 at 12.

On direct appeal, Petitioner's counsel argued unsuccessfully that the trial court had committed
reversible error by failing to allow the juror to testify.  The Court of Special Appeals affirmed the trial court,
finding neither error nor abuse.  *Id.*, Ex. 24 at 12-13.

Claims based on violations of state law or procedure that do not constitute an infringement of a
specific constitutional protection or fundamental fairness are not cognizable on federal habeas review.  *See*
*Estelle v. McGuire*, 502 U.S. 62, 67-75 (1991).  In this case, Petitioner has failed to identify any
constitutional provision on which he bases this claim.  Petitioner was similarly silent on direct review.  *See*
Paper No. 12, Ex. 22 at 8-11.  Further, the decisions of the trial and appellate court are supported by
Maryland state law.  The Supreme Court has recognized that "it is not within the province of a federal
habeas court to reexamine state court determinations on state law questions."  *Estelle*, 502 U.S. at 67-68;
*see also Spencer v. Murray*, 5 F.3d 758, 762 (4th Cir. 1994) (stating absent circumstances infringing a
specific  constitutional  protection  admissibility  of  evidence  does  not  present  a  federal  question).
Consequently, Petitioner has failed to state a cognizable claim for federal collateral relief on this ground.
*See* 28 U.S.C. §2254(a).

The Court is, however, mindful that under some circumstances, it is appropriate to hold a hearing
to evaluate whether juror misconduct has occurred and the impact that the misconduct might have had on

trial. *See Tanner v. United States*, 483 U.S. 107, 116-17 (1987); *Remmer v. United States*, 347 U.S. 227, 228-30 (1954); *Rushen v. Spain*, 464 U.S. 114, 122-31 (1983). This case, however, does not present such a circumstance. Petitioner did not predicate his claim on a federal constitutional right on direct appeal, nor does he do so now. For these reasons, the claim will be denied.

### C.  Ineffective Assistance of Trial Counsel

Petitioner claims that he received ineffective assistance when trial counsel failed to: (i) meet with Petitioner or respond to his communications in advance of trial as to adequately and properly prepare a defense; (ii) forward any of the discovery in the case to Petitioner; and (iii) to meet with witnesses.

In their Answer, Respondent asserts that Petitioner is procedurally defaulted from asserting his Sixth Amendment claims against attorney David Eaton because, although raised in his original post-conviction petition, these claims were abandoned during the course of collateral review proceedings.

The Court concurs. As noted above, however, the Court must consider whether it should reach the merits of these defaulted claims in order to prevent a fundamental miscarriage of justice. *See Schlup v. Delo*, 513 at 318-20. The miscarriage of justice standard is directly linked to innocence. *Id.* at 320. Innocence is not an independent claim; rather, it is the "gateway" through which a petitioner must pass before a court may consider constitutional claims which are defaulted. *Id.* at 314. The miscarriage of justice exception applies where a petitioner shows that "a constitutional violation has probably resulted in the conviction of one who is actually innocent." *See Murray v. Carrier*,  477 U.S. at 496; *Schlup*, *supra*. To meet this standard a petitioner must show that it is more likely than not that no reasonable juror would have found petitioner guilty beyond a reasonable doubt. *Schlup*, 513 U.S. at 327.

Petitioner has failed to make the requisite demonstration of the the existence of cause for his failure to properly raise the instant ineffective assistance claims in the state courts properly and prejudice resulting from this failure.  He has presented no evidence, nor suggested that any exists, which could satisfy the difficult standard set forth in *Schlup*.  Petitioner's procedurally defaulted claims are, therefore, foreclosed from federal habeas review.

### D.  Failure to Strike a Juror

Petitioner next claims that the trial court erred because it did not strike a juror who knew the victim's mother.  According to the trial transcript, a juror informed Judge Friedman that she recognized someone in the courtroom. The court proceeded to *voir dire* the juror. The following exchange ensued:

THE COURT:      Ms. Edwards.  You wanted to communicate something to this Court?

JUROR:      Yes, Thursday I was sitting on the jury panel and I saw someone in the courtroom. Now, her last name is Bennett, but I don't know what connection it is with this, and I really know her, I just -- she's like a Vice-Principal at one of the schools that I used to work at. So I don't -- I don't know her personally. I don't know her.

THE COURT:      Would the fact that you recognized her keep you from giving a fair and impartial decision in this case?

JUROR:      No.

Paper No. 12,  Ex. 11 at 13-14.

The post conviction court considered this issue in the context of Petitioner's ineffective assistance of counsel claim and concluded that trial counsel's failure to investigate further the relationship between the juror and the victim's mother did not constitute constitutionally deficient assistance of counsel under the

standard set forth in *Strickland v. Washington*, 466 U.S. 668, 687 (1984).  *See* Paper No. 12, Ex. 29

at 32-34, 43, & 45-48; Ex. 31 at 2, & 5-6.  The post conviction court ruled:

> In the most favorable light to the Petitioner, at best, there was an employer/employee relationship between juror number 7 and Michael Bennett's mother. The juror stated to the court that she did not know Ms. Bennett but did recognize her from one of the schools she used to work for. She acknowledged that this recognition would not prevent her from rendering a fair and impartial decision in the case. The fact that trial counsel did not inquire further into the nature and extent of the relationship does not constitute a professional error. Nor does it indicate that his performance fell below an objective standard of reasonableness considering all circumstances. After the juror assured the court that she could render a fair and impartial decision, despite recognizing Ms. Bennett, there was nothing more trial counsel could do.

Paper No. 12, Ex. 31 at 6.

Within the context of a Sixth Amendment right to an impartial jury or to due process under the

Fourteenth Amendment, the Supreme Court has ruled that "[a] trial judge's findings of juror impartiality

may 'be overturned only for "manifest error." '" *Mu'min v. Virginia*, 500 U.S. 415, 428 (1991)(citations

omitted).  In light of the juror's answers during the *voir dire*, the trial court acted appropriately when it

concluded there was  no reason to question the juror's ability to render a fair and impartial verdict.

Additionally, without a request to strike the juror, the trial court cannot be faulted for allowing the juror to

remain on the jury.  *See* Md. Rule 4-323(c) (state procedural rule requires objection).  Consequently, the

Court finds no basis for granting habeas relief as to this claim.

For the reasons stated herein, the instant Petition for habeas corpus relief shall be denied and the

case shall be dismissed with prejudice.  A separate Order follows.

Date: <u>April 26, 2005</u>                              <u>          /s/          </u>
                                                      William D. Quarles, Jr.
                                                      United States District Judge